UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN R.S. DOE**,

Plaintiff,

vs.

**THE UNIVERSITY OF MICHIGAN**,

and

**THE REGENTS OF THE
UNIVERSITY OF MICHIGAN** (official
capacity only);

Defendants.

Case No:  21-cv-
Hon.
Mag.

_____

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

_____

**COMPLAINT AND JURY DEMAND**

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................. 1

II.     PARTIES, JURISDICTION, AND VENUE ............................................................. 4

III.    GENERAL ALLEGATIONS: DR. ANDERSON'S EMPLOYMENT WITH
        U OF M AND 8 ALLEGATIONS OF SEXUAL ABUSE PRIOR TO
        PLAINTIFF'S ASSAULT ..................................................................................... 8

IV.     FOR YEARS PRIOR TO PLAINTIFF'S ASSAULT BY DR. ANDERSON, U
        OF M AND ITS AGENTS KNEW OF DR. ANDERSON COMMITTING
        ACTS OF SEXUAL ABUSE AGAINST U OF M STUDENTS ................................... 10

V.      PLAINTIFF JOHN R.S. DOE'S ALLEGATIONS AND HIS DAMAGES
        FOR ALL CAUSES OF ACTION ......................................................................... 40

VI.     THE PHYSICIAN-PATIENT FIDUCIARY RELATIONSHIP CREATED
        BY U OF M ..................................................................................................... 46

VII.    THE FRAUDULENT CONCEALMENT OF DR. ANDERSON'S SEXUAL
        ABUSE ............................................................................................................ 48

VIII.   CAUSES OF ACTION AGAINST ALL DEFENDANTS ............................................ 62

        A.     COUNT I: VIOLATIONS OF TITLE IX – 20 U.S.C. § 1681, ET. SEQ. ........ 62

        B.     COUNT II: VIOLATIONS OF CIVIL RIGHTS – 42 U.S.C. § 1983 ............... 68

IX.     ADDITIONAL CAUSES OF ACTION ................................................................... 72

X.      REQUEST FOR RELIEF AND JURY DEMAND ................................................... 73

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, John R.S. Doe, by and through his attorneys, Deborah Gordon Law, and hereby alleges and states as follows:

> **A civil action between these parties or other parties arising out of the transaction or occurrent alleged in this complaint has been previously filed in Eastern District of Michigan – Southern Division, where it was given docket number 2:20-cv-10568-VAR-EAS and was assigned to Judge Victoria A. Roberts, and has been designed the lead case for these related cases.**

## I.  INTRODUCTION

1.      For over thirty years, Dr. Robert E. Anderson ("Dr. Anderson"), a prolific sexual predator, was granted unfettered access to students, student athletes, and other adults and minors in multiple communities across the State of Michigan by the University of Michigan (the "University") and The Regents of the University of Michigan ("Regents") (collectively "U of M" or "Defendants"), who employed him as a physician from the early 1960s until 2003, when he resigned.

2.      Dr. Anderson used his U of M granted access to sexually assault and abuse hundreds, if not thousands, of boys, girls, men, and women over the course of his U of M career. Primarily, Dr. Anderson would, at a minimum, digitally penetrate the men and boys' anuses, digitally penetrate the women and girls' vaginas, grope and fondle the men and boys' penises, grope and fondle the women and girls' breasts, request that the men and boys' grope and fondle his own penis and his testicles for his own sexual gratification under the guise and fallacy of providing medical examinations.

1

3.     To commit his abuse, Dr. Anderson used his position of trust, power, and authority as a U of M endorsed and employed doctor and committed the abuse under the guise of medical treatment.

4.     As early as 1968, and on information and belief even earlier, U of M received complaints from male students about Anderson sexually assaulting them during putative medical examinations.

5.     As early as 1969, and on information and belief even earlier, U of M received complaints from male student-athletes about Anderson sexually assaulting them during putative medical examinations. These reports continued throughout Anderson's career. There are at least seven known reports, some of which were written reports, of sexual abuse that were made to U of M prior to Anderson's retirement in 2003.

6.     Upon information and belief, in 1979, U of M initially fired Anderson from his position as University Health Services ("UHS") Director after receiving repeated complaints that Anderson was sexually assaulting male students during medical examinations on campus, an allegation Anderson did not deny.

7.     However, U of M ultimately overrode the decision to terminate Anderson, and allowed him to stay at UHS as a "senior physician" where he continued to see and sexually assault male students and/or student-athletes.

8.     In 1981, U of M moved Anderson to the position of full-time Athletic Department physician, where he predictably continued sexually assaulting male student

2

athletes, most of whom were attending U of M on athletic scholarships, or with grants-in-aid, or as members of various sports teams, including among others, football, wrestling, hockey, gymnastics, basketball, baseball, cheerleading, and track and cross-country teams, until he retired in 2003.

9.     U of M could have terminated and removed Dr. Anderson and exposed him as the prolific abuser that he was after receiving credible information on multiple occasions about the sexual assaults he had committed.

10.     Instead, despite numerous reports of sexual abuse against its students and student- athletes, U of M chose to continue enabling and allowing Dr. Anderson's abuse until his voluntary retirement from U of M in 2003.

11.     Despite knowledge of Dr. Anderson's sexually assaultive, harassing, and predatory behavior, U of M failed to take any action to protect hundreds if not thousands of vulnerable boys, young men, girls, and young women, including Plaintiff.

12.     While each individual survivor was sexually abused by Dr. Anderson while he was employed as a doctor by U of M, the time, place, and abusive acts committed against Plaintiff are unique and each individual survivor has been impacted in his or her own unique way by the abuse he or she suffered.

13.     In general, however, Dr. Anderson followed a pattern, by which he would sexually abuse individuals sent to him under the guise of providing medical treatment performed by a renowned U of M doctor. Dr. Anderson repeatedly and habitually sexually abused boys, young men, girls and young women by performing extended and

unnecessary digital-rectal and digital-vaginal examinations, masturbating his "patients," masturbating himself during his "treatments", groping genitals and breasts, verbally abusing his "patients", and by committing various other acts of sexual misconduct for his own perverse pleasure.

14.     U of M managed to keep its knowledge of Anderson's sexually predatory acts protected from public disclosure, and more importantly, disclosure to U of M students and student athletes, through a calculated campaign of artifice and continued misrepresentations, with both affirmative and omissive acts and misstatements to, among others, the public, the U of M university community, unknowing and unwitting coaches and trainers, and students and student athletes to fraudulently conceal Anderson's predatory acts in an intentional and deliberately indifferent manner.

15.     U of M is responsible for Plaintiff's damages stemming from Anderson's sexual assaults on U of M's campus, as U of M placed vulnerable student athletes like Plaintiff in Anderson's care despite knowing he was a sexual predator.

16.     To this day, U of M has not made amends for the horrific history of Dr. Anderson's sexual abuse.

17.     Therefore, this lawsuit seeks justice on behalf of Plaintiff John R.S. Doe ("Plaintiff") against the enablers and perpetrator of his sexual abuse and seeks declaratory, injunctive, equitable, and monetary relief.

## II.     PARTIES, JURISDICTION, AND VENUE

18.     This Complaint has common issues of law and fact with other cases currently pending in the Eastern District of Michigan. *John Doe MC-1 v. The University of Michigan, et al.*, Case Number: 2:20-cv-10568-VAR-EAS has been designated the lead case for these related cases.

19.     Plaintiff was sexually abused and assaulted by U of M's Dr. Anderson, under the guise of a medical examination, as more fully set forth below.

20.     Plaintiff was sexually abused by Dr. Anderson during the time period that Dr. Anderson was employed by U of M, approximately 1966 to 2003.

21.     Upon information and belief, Dr. Anderson died on November 27, 2008.

22.     At all relevant times to the allegations in this Complaint, Dr. Anderson maintained an office on U of M's campus in the City of Ann Arbor, Washtenaw County, State of Michigan.

23.     At all relevant times to the allegations in this Complaint, Dr. Anderson was acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or U of M.

24.     The University was at all relevant times and continues to be a public college organized and existing under the laws of the State of Michigan.

25.     The University receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

26.     The University is primarily located in the City of Ann Arbor, Washtenaw County, State of Michigan, but also operates satellite clinics as part of its health services, also located in the City of Ann Arbor, State of Michigan.

27.     The University is governed by the Board of Regents, which consists of eight members elected at large in biennial statewide elections. The president of the University serves as an ex officio member of the board.

28.     The Regents have general supervision of the institution [the University] and 'the control and direction of all expenditures from the institution's funds.

29.     The Regents is currently composed of Jordan B. Acker, Michael J. Behm, Mark J. Bernstein, Paul W. Brown, Shauna Ryder Diggs, Denise Ilitch, Ron Weiser, and Katherine E. White

30.     Upon information and belief, the Regents primarily perform their official duties in the City of Ann Arbor, Washtenaw County, State of Michigan.

31.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, et seq., the United States Constitution, 42 U.S.C. § 1983, and under Michigan law as more fully set forth herein.

32.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States, including but not limited to, Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

33.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343, which gives district courts original jurisdiction over any civil actions authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

34.     Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

35.     The events giving rise to this lawsuit primarily occurred in Washtenaw County, Michigan, which sits in the Southern Division of the Eastern District of Michigan.

36.     Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

37.     The amount in controversy in this matter exceeds $75,000.00.

38.     On June 24, 2020, Judge Victoria A. Roberts entered an Order Establishing Master Case [Dkt. 52] in Case No.: 2:20-cv-10568-VAR-EAS establishing

Doe MC-1 v. The University of Michigan, et al. as the lead case for "all cases alleging sexual abuse against these [the University of Michigan and the Regents of the University of Michigan] and involving Dr. Robert Anderson." Dkt. 52 at 22. The undersigned counsel in this action have filed Appearances as Interested Parties in the lead case.

## III.   GENERAL ALLEGATIONS: DR. ANDERSON'S EMPLOYMENT WITH U OF M AND 8 ALLEGATIONS OF SEXUAL ABUSE PRIOR TO PLAINTIFF'S ASSAULT

39.    From the early 1960s until 2003, Dr. Anderson was a physician employed by U of M treating students on U of M's Ann Arbor campus, during which time U of M gave Anderson unfettered access to young college students, including young male and female student-athletes.

40.    During his tenure at U of M, Dr. Anderson held numerous titles, including Director of Health Services, Senior Physician with UHS, and Athletic Senior Physician.

41.    In all of these roles, and throughout the entirety of his employment with U of M, Dr. Anderson, under the guise of conducting a medical examination, regularly and repeatedly sexually assaulted, abused, and molested male and female students, and other patients, by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to, medically unnecessary genital and breast manipulation and digital anal and vaginal penetration.

42.    In his roles with UHS, Dr. Anderson regularly saw students and adults as patients for general health-related inquiries, medical ailments, physical examinations, prescription drug consultations, and military draft consultations.

43.     In his role as an Athletic Physician, Dr. Anderson treated members of the wrestling, football, track and field, hockey, volleyball, swimming, baseball, tennis and other athletic teams for nearly every medical ailment, complaint, and injury as the U of M assigned internist.

44.     Anderson served as one of his first medical points of contact no matter the injury or ailment at issue, including everything from a cold to broken bones. Indeed, student-athletes were required to see Dr. Anderson even when they were not injured; regular physicals and checkups with Dr. Anderson were required for all student-athletes.

45.     Upon information and belief, in the early 1960s, U of M began employing Dr. Anderson to treat students and student athletes at U of M facilities.

46.     On or about September 1, 1966, U of M appointed Dr. Anderson to the position of Clinical Instructor in Internal Medicine and Clinical Instructor in Surgery, Medical School and the Senior Physician of UHS.

47.     It was sometime soon after beginning employment with U of M that, according to Ambassador Ron Weiser, the current chair of the U of M Regents, Dr. Anderson abused Ambassador Weiser while Ambassador Weiser was a freshman wrestler at U of M in 1962 or 1963.

48.     On or about October 1, 1968, U of M promoted Dr. Anderson to UHS Director, and Dr. Anderson continued as the Athletic Department's primary care physician and team physician for many of U of M's athletic teams.

49.     Throughout Dr. Anderson's tenure at U of M, beginning in 1968 at the latest, U of M repeatedly received complaints about Dr. Anderson's sexual misconduct and predatory conduct.

50.     Despite its knowledge of Dr. Anderson's sexual misconduct and predatory behavior and nature, U of M concealed Dr. Anderson's misconduct and continued to allow Dr. Anderson access and opportunity to abuse U of M students and others until he voluntarily retired in 2003. In so doing, U of M put its own reputation above the safety of its students.

## IV.  FOR YEARS PRIOR TO PLAINITFF'S ASSAULT BY DR. ANDERSON, U of M AND ITS AGENTS KNEW OF DR. ANDERSON COMMITTING ACTS OF SEXUAL ABUSE AGAINST U of M STUDENTS

### The First Known Report: Gary Bailey, 1968

51.     In 1968, a U of M student, Gary Bailey, went for an examination by Dr. Anderson during which he was sexually assaulted by Anderson, who "felt my penis and genitals, and subsequently…wanted me to feel his (Dr. Anderson's) penis and genitals." Mr. Bailey later described the examination to the Detroit News as "very traumatic[1]."

---

[1] *See* Kim Kozlowski, *Alum Says He Told UM of Doctor's Sex Abuse in '68 But Never Got A Response*, https://www.detroitnews.com/story/news/local/michigan/2020/02/20/alum-says-he-told-university-michigan-about-doctor-sex-abuse/4817480002/, (last visited September 3, 2021)

52.     Mr. Bailey filed a written complaint with the UHS by filling out a form complaining that Dr. Anderson had dropped his pants and asked him to fondle his genitals during the exam.

53.     No one from UHS or any other U of M agency followed up with Mr. Bailey or contacted him as part of an investigation into Mr. Bailey's written sexual assault complaint.

54.     On information and belief, U of M never acted on or investigated Mr. Bailey's complaint of sexual abuse committed by Dr. Anderson.

55.     U of M was put on notice of Dr. Anderson's sexually deviant behavior when U of M received Mr. Bailey's report in 1968.

56.     As of 1968, U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of Mr. Bailey's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

57.     Despite this notice, U of M knowingly allowed and enabled a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

58.     If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

**The Second Known Report: Ward Black, 1969**

59.     In 1969, a U of M scholarship gymnast named Ward Black talked to U of M Gymnastics Coach Newt Loken about Dr. Anderson's conduct, and in doing so gave notice to the U of M Athletic Department and U of M of Dr. Anderson's sexual abuse.

60.     Mr. Black, who is the former University of Oklahoma and Washington State University gymnastics coach, saw Dr. Anderson for a physical examination for the first time as a freshman scholarship gymnast at U of M in 1969.

61.     During this 1969 physical, Dr. Anderson digitally penetrated Mr. Black's rectum.

62.     Afterwards, Mr. Black tried to express his concern about this act to his U of M gymnastics coach, Newt Loken, by stating to Coach Loken words to the effect of "what was up with Dr. A?" In response, Coach Loken patted Mr. Black on the knee, smiled a "wry Cheshire grin," and changed the subject[2].

63.     Based on that reaction, Mr. Black "knew he knew. We all knew he knew" and did not complain again. *Id.*

64.     When Mr. Black made his report of sexual abuse committed by Dr. Anderson, Coach Loken was an agent of both the Athletic Department and U of M.

65.     U of M and Coach Loken did not investigate Mr. Black's complaint about the sexual abuse committed against him by Dr. Anderson.

---

[2] *See* Ed White, *Former Michigan Gymnast Says Doctor Assaulted Him In 1969*, https://abcnews.go.com/Sports/wireStory/michigan-gymnast-doctor-assaulted-1969-71205734, (last visited September 3, 2021).

66.     Coach Loken continued to coach the gymnastics team until 1983 and remained affiliated with the gymnastics program and Athletic Department until, at least 2007.

67.     On information and belief, U of M never acted on and/or investigated Mr. Black's complaint of sexual abuse committed Dr. Anderson.

68.     U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when U of M received Mr. Black's report.

69.     U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of Mr. Black's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

70.     Despite this notice, U of M knowingly allowed and enabled a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

71.     If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

**The Third Known Report: Cathy Kalahar, 1975**

72.     In 1973, Ms. Cathy Kalahar was a freshman at the University, where she was a member of the women's tennis team until 1975[3].

73.     Ms. Kalahar has come forth publicly and alleged that while visiting Dr. Anderson for a routine medical examination, Dr. Anderson ordered her to fully undress before he roughly grabbed her breasts, made crude comments about her breasts, and digitally penetrated her vagina with his ungloved fingers. *Id.*

74.     It has been reported that Ms. Kalahar has stated that "He [Dr. Anderson] told me that I should have them [her breasts] cut down because, while men like large breasts, mine were so large that they would not be attractive or pleasant to men." *Id.*

75.     After Dr. Anderson made these crude comments about her breasts that he told Ms. Kalahar that if she wasn't willing to have the reduction surgery that she should consider becoming a lesbian.

76.     After making these comments, Dr. Anderson digitally penetrated Ms. Kalahar's vagina with his ungloved fingers.

77.     At the end of the medical examination, Dr. Anderson gave Ms. Kalahar a referral card to see a female therapist at UHS to "figure out my [Ms. Kalahar's] breast and my [Ms. Kalahar's] lover problem." *Id.*

---

[3] *See* Steve Marowski, *Late University of Michigan athletic doctor 'was coldest, meanest psychopath I've ever met,' female survivor says*, MLive Michigan, https://www.mlive.com/news/ann-arbor/2020/07/late-university-of-michigan-athletic-doctor-was-coldest-meanest-psychopath-ive-ever-met-female-survivor-says.html (last visited September 3, 2021).

78.     Eventually, Ms. Kalahar decided to meet with the psychological counselor at UHS that Dr. Anderson referred her to.

79.     Ms. Kalahar reported Dr. Anderson's sexual abuse to the U of M psychological counselor that Dr. Anderson referred her to. *Id.*

80.     The psychological counselor ignored Ms. Kalahar's report of sexual abuse and brushed it off as a "sexual fantasy." *Id.*

81.     On information and belief, U of M never acted on and/or investigated Ms. Kalahar's complaint of sexual abuse committed Dr. Anderson.

82.     U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when it received Ms. Kalahar's report.

83.     U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of Ms. Kalahar's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

**The Fourth Known Report: Tad DeLuca, 1975**

84.     In 1975, co-Plaintiff Tad DeLuca, U of M student and scholarship member of U of M's wrestling team, gave notice of Dr. Anderson's sexual misconduct in a 9-page letter to U of M's head wrestling coach at the time, Bill Johannesen, complaining that "Something [was] wrong with [Anderson]" and "[r]egardless of what you are there for, Dr. Anderson makes you drop your drawers."

85.     U of M and Coach Johannesen did not investigate Deluca's complaint about the sexual abuse committed against him by Dr. Anderson.

86.     Rather than investigate Deluca's complaints, U of M retaliated against Deluca by stripping him of his athletic scholarship, financial aid, and kicking him off the wrestling team.

87.     Deluca appealed to then University Athletic Director Don Canham who was provided a copy of the letter sent to Coach Johannesen, giving Director Canham notice of the allegations against Anderson.

88.     Director Canham did not investigate the sexual abuse complaints against Dr. Anderson, and instead, upheld the revocation of Deluca's athletic scholarship.

89.     It is unsurprising that Director Canham did not investigate Deluca's allegations as Director Canham had been collaborating with Dr. Anderson for nearly a decade when Director Canham received Mr. Deluca's report, at the latest since November 1968[4].

90.     In fact, Dr. Anderson wrote to Director Canham in 1968 that "I have attempted to make a preseason physical examination compulsory for all athletes..." Dr. Anderson further wrote that "This works quite well as a recommendation, but it lacks

---

[4] See David Jesse, *Archive Papers Show Doctor's Ties to Bo Schembechler's Michigan Football Program*, FREEP.COM, https://www.freep.com/story/sports/college/university-michigan/wolverines/2020/03/09/university-of-michigan-football-doctor-robert-anderson-bo-schembechler/4957066002/, (last visited September 9, 2021).

teeth for the few athletes and coaches who do not heed suggestions without a little prodding." *Id.*

91.     Director Canham responded to Dr. Anderson's letter, in part, by writing that "I assure you that we will implement the program as you outlined it. I think that probably the first thing we should do is set a date for all sports as to when the physical must be complete." *Id.*

92.     After being stripped of his scholarship and financial aid, Mr. Deluca hired an attorney and appealed to U of M's Board of Intercollegiate Athletics to have his scholarship reinstated.

93.     Coach Johannesen has admitted to hearing jokes about Anderson's proclivity to "examine" the genitals of male student-athletes. According to Coach Johannesen, "[t]he joke was that you go to see [Anderson], and you have a sore elbow, he would say, 'OK, pull your pants down.'"[5]

94.     Because so many student-patients were victims of Dr. Anderson, he was referred to by them as "Dr. Drop Your Drawers."[6]

---

[5] *See* Kim Kozlowski, *Ex-Wrestler Says UM Ignored His Abuse Claims, Kicked Him Off Team*, DETROITNEWS.COM, https://www.detroitnews.com/story/news/local/michigan/2020/02/27/former-university-michigan-athletes-abuse-allegations-robert-anderson/4869148002/, (last visited September 9, 2021).

[6] *See* Kim Kozlowski, *UM Official 'Fired' Doctor Accused Of Sex Abuse, But He Stayed On Another 24 Years*, DETROITNEWS.COM, (last visited July 13, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/02/21/michigan-doctor-fired-sex-abuse-served-football-team-doctor-24-more-years/4835017002/.

95.     On information and belief, U of M never acted on and/or investigated Deluca's complaint of sexual abuse committed Dr. Anderson.

96.     U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when U of M received Deluca's report.

97.     U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of Deluca's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

98.     Despite this notice, U of M knowingly allowed and enabled a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

99.     If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

**The Fifth Known Report: Plaintiff John Doe MC-16, 1976**

100.    Plaintiff John Doe MC-16, who filed a complaint in Case Number 2:20-cv- 10622-VAR-EAS in the Eastern District of Michigan on March 8, 2020, attended U of M in the 1970's on a track athletic scholarship[7].

---

[7] *See also* Kim Kozlowski, Lawsuit: *2 UM officials Knew About Doctor's Alleged Abuse*, DETROITNEWS.COM, (last visited September 9, 2021), https://www.detroitnews.com/story/news/local/michigan/2020/03/08/lawsuit-two-more-um-officials-alerted-about-doctors-alleged-assaults/4995055002/.

101. Dr. Anderson repeatedly groped John Doe MC-16's penis and testicles and digitally penetrated his anus once during approximately 25 visits to Dr. Anderson for a variety of illnesses and injuries.

102. After one of those visits in 1976, John Doe MC-16 approached both his head coach, Jack Harvey, and assistant coach, Ron Warhurst, and told them that Dr. Anderson was touching and groping his penis and testicles during Dr. Anderson's medical examinations.

103. Dr. Anderson had already digitally penetrated John Doe MC-16's anus at the time John Doe MC-16 told U of M coaches Harvey and Warhurst about the genital groping, but John Doe MC-16 was too embarrassed to tell his coaches about the penetration.

104. After reporting Dr. Anderson's "odd" or "weird" conduct to Coach Harvey and Coach Warhurst, John Doe MC-16 further asked to go to another physician so he could get medical assistance for his medical needs.

105. Both Coach Harvey and Coach Warhurst laughed at John Doe MC-16's complaint and refused to send him to a different physician.

106. It was this type of indifference, acceptance, and promotion of Dr. Anderson's acts by coaches that normalized Dr. Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in U of M athletics.

107.    This was even more egregious given former U of M Athletic Director Canham's utter indifference to Mr. DeLuca's complaint about Dr. Anderson de facto normalized and enshrined Dr. Anderson's acts as simply "department policy" or protocol for the medical treatment of all athletes.

108.    During this same period, in the mid-1970s, numerous track athletes called Dr. Anderson "pants down doctor."

109.    During this same period, both Coach Harvey and Coach Warhurst were agents of the Athletic Department, and of U of M.

110.    On information and belief, U of M never acted on and/or investigated John Doe MC-16's complaint of sexual abuse committed Dr. Anderson.

111.    U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when U of M received John Doe MC-16's report.

112.    U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student- athletes because of John Doe MC-16's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

113.    Despite this notice, U of M knowingly allowed a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

114.    If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

## The Sixth Known Report: John Doe WL-28, 1976

115.    John Doe WL-28 who filed a complaint in Case Number 2:20-cv-12038-VAR- EAS in the Eastern District of Michigan on July 30, 2020, was sexually abused by Dr. Anderson hundreds of times between 1976 and 1981 as a student-athlete at the University as more fully set forth below.

116.    John Doe WL-28 was sexually abused and molested by Dr. Anderson under the guise of medical treatment.

117.    John Doe WL-28's coaches at U of M, Jack Harvey and Ron Warhurst, were aware of the sexual abuse being committed by Dr. Anderson against U of M student-athletes, ignored this information, and continued to force student- athletes to see Dr. Anderson for medical examinations.

118.    In September of 1976, John Doe WL-28 was present when U of M Coach Warhurst discussed and joked with him and other student-athletes about the sexual abuse being committed by Dr. Anderson during routine medical examinations.

119.    In response to John Doe WL-28's report of sexual abuse, U of M Coach Warhurst told him "deal with it fucker."

120.    In other instances, U of M Coach Warhurst stated in essence that "So you have a sore throat, you have to go to Anderson, drop your drawers, and get your hernia checked," while laughing about the matter.

121.   U of M Coaches Harvey and Warhurst were aware of the sexual abuse being committed by Dr. Anderson at the latest in September 1976 and took no action to protect his student-athletes.

122.   At all relevant times to John Doe WL-28's allegations in this Complaint, Dr. Anderson was employed as a doctor by U of M.

123.   Dr. Anderson committed his sexual abuses and molestations against John Doe WL-28 while in a position of trust, authority, and power granted to him by U of M.

124.   The actions of U of M concealed the true nature of the sexual abuse and molestation committed against John Doe WL-28 by Dr. Anderson.

125.   U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when U of M received John Doe WL-28's report.

126.   U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of John Doe WL-28's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

127.   Despite this notice, U of M knowingly allowed a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

128.   If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

**The Seventh Known Report: A U of M Graduate Student, 1979**

129.    According to records of the Washtenaw County Prosecutor's Office, in 1979 a then-graduate student at the U of M was seen by Dr. Anderson at the UHS when Dr. Anderson "gave undue attention to my genitals and rectal area. It was very physically and socially uncomfortable...he inserted his finger into my rectum for a period that was longer than any other hernia or rectal evaluation."

130.    This graduate student complained loudly to the desk clerk, and then an administrator, both of whom "dismissed" him and ordered a security guard to escort him out of UHS.

131.    On information and belief, U of M never acted on and/or investigated the graduate student's complaint of sexual abuse committed Dr. Anderson.

132.    U of M was once again put on notice of Dr. Anderson's sexually deviant behavior when U of M received the graduate student's report.

133.    U of M knew of Dr. Anderson's predatory behavior and his habits, temperament, and nature to sexually harass and assault students and student-athletes because of the graduate student's complaint made to U of M, if U of M was not already aware of Dr. Anderson's dangerous nature.

134.    Despite this notice, U of M knowingly allowed a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

135.   If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

**The Eighth Known Report: A U of M Student Life Employee, 1979**

136.   U of M was warned again in 1979 by a U of M Student Life employee and activist that Dr. Anderson was a sexual predator preying on students.

137.   The U of M Student Life employee and local U of M activist told his boss, Tom Easthope, the then Vice President of Student Life at U of M, that Dr. Anderson had assaulted several members of the gay community at U of M.

138.   Vice President Easthope, who as Vice President of Student Life had supervisory oversight of the UHS, described the gist of his subordinate's information as Dr. Anderson was "fooling around with boys in the exam room."

139.   The U of M Student Life employee who made the report to Vice President Easthope had personal knowledge of Dr. Anderson's abuse because when that Student Life employee was examined by Dr. Anderson during a routine physical, Dr. Anderson stuck his finger in the Student Life employee's anus, and when the employee jumped from pain and discomfort, Dr. Anderson stated, "I thought that you would have enjoyed that!"

**Due to the Eighth Known Report, U of M "Demoted" but Did Not Fire Dr. Anderson, Allowing His Access to U of M Students, and His Sexual Assaults to Continue**

140.    After this report, U of M knew and acknowledged that Dr. Anderson was a sexual predator.

141.    Based on the information reported to him, Vice President Easthope decided to terminate Dr. Anderson but was nervous because Dr. Anderson was "big shot" at U of M.

142.    Vice President Easthope confronted Dr. Anderson about Dr. Anderson's abuse of the Student Life employee and that he was fooling around in the exam rooms with male students.

143.    Dr. Anderson did not deny Vice President Easthope's accusations.

144.    At that time, Vice President Easthope told Dr. Anderson, "You gotta go[8]."

145.    After "firing" Dr. Anderson, Vice President Easthope decided to allow Dr. Anderson to resign to avoid an employee termination dispute.

146.    During this time, Vice President Easthope was an agent of U of M.

147.    Neither Vice President Easthope nor his superiors or subordinates followed up to ensure that Dr. Anderson left the University after his severance from UHS.

---

[8] *See* David Jesse, *Former U-M wrestler: I blew whistle On U-M doctor in 1975, Was Dismissed From Team*, FREEP.COM, (last visited September 9, 2021), https://www.freep.com/story/news/education/2020/02/27/robert-anderson-university-of-michigan-tad-deluca-sex-abuse scandal/4890575002/.

148.    When recently confronted about Dr. Anderson, former Vice President Easthope stated that "I bet there are over 100 people that could be on that list (of young men abused by Dr. Anderson)."

149.    According to U of M human resource records, instead of terminating Dr. Anderson from his positions with the University, U of M "demoted" Dr. Anderson effective January 14, 1980 and moved him to the Athletic Department to be the primary care physician.

150.    The reason for Dr. Anderson's transfer as stated in Dr. Anderson's personnel file was "resuming former position."

151.    U of M's reassignment of Dr. Anderson gave him further access to students and student-athletes to sexually abuse under the guise of medical treatment.

152.    According to longtime U of M athletic trainer Russell Miller, after Dr. Anderson's transfer from UHS, Athletic Director Canham, a legendary and powerful figure at the University, "worked out a deal" to increase Dr. Anderson's role in the Athletic Department.

153.    Despite U of M's knowledge of Dr. Anderson's misconduct, it continued to hold him out as a leader in its healthcare community.

154.    U of M went so far as to fraudulently conceal Dr. Anderson's predatory sexual misconduct, intentionally concealing the reason for Dr. Anderson's departure as Director of UHS.

155.     Despite its knowledge that Dr. Anderson was sexually abusing students and student-athletes, U of M praised Dr. Anderson in its 1980 publication Volume III of the President's Report of The University of Michigan for 1979-1980.

156.     The U of M publication states in its "Acknowledgement" preface: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine...his many contributions to health care are acknowledged...The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him."

157.     It further confirms that after his transfer, Dr. Anderson "continue[d] as a senior physician on the medical staff" at U of M.

158.     Thereafter, Dr. Anderson had free rein to abuse thousands of students, including Plaintiff, with impunity.

159.     Even upon learning of more allegations, U of M continued to protect Dr. Anderson and its own reputation instead of the safety of its students and student-athletes.

160.     Despite this notice, U of M knowingly allowed and enabled a sexual predator to directly work with students, student-athletes, staff, administration, and the public until 2003.

161.   If U of M would have acted on this information and notice that Dr. Anderson was a sexual predator, hundreds, if not thousands, of acts of sexual abuse and assault could have been prevented by U of M.

162.   Plaintiff was sexually assaulted and abused by Dr. Anderson in 1981. Thereafter, U of M continued to receive reports about sexual abuse and assaults perpetrated by Dr. Anderson, including the following:

- In 1982 and 1983 a U of M student-employee, John Doe EB-17, was sexually assaulted by Anderson, who digitally rectally penetrated him instead of treating his migraine headaches. John Doe EB-17 reported the sexual abuse directly to esteemed Head Football Coach "Bo" Schembechler, who directed John Doe EB-17 to report the sexual abuse directly to then University Athletic Director Don Canham on two occasions in 1982 and 1983. Upon information and belief, Athletic Director Canham took no action and failed to investigate the allegations of sexual abuse committed by Dr. Anderson raised by John Doe EB-17.

- In 1988-1989, John Doe EB-19, a U of M student-athlete, was sexually abused and molested by Dr. Anderson from approximately 1988 to 1989 during required physical examinations. In 1988, John Doe EB-19 reported the sexual abuse to Russ Miller, the then Head Trainer for the University football team. Upon information and belief, Head Trainer Miller took no action and failed to investigate the allegations of sexual abuse committed by Dr. Anderson.

- In 1994, a former U of M student reported that in 1973 Dr. Anderson fondled his genitals to the point of ejaculation at the UHS clinic. The complainant reported the abuse in 1994 to the predecessor of Michigan's Department of Licensing and Regulatory Affairs ("LARA"). Upon information and belief, in the ordinary course of a reported sexual assault by a regulated professional, LARA would have contacted U of M as Dr. Anderson's employer. Yet, U of M continued to employ Dr. Anderson until his voluntary retirement in 2003, and, on information and belief, U of M never acted on and/or investigated the former student's complaint of sexual abuse committed Dr. Anderson.

163.   In addition to the numerous known reports of sexual abuse to U of M officials, U of M's condoning of Dr. Anderson's predatory conduct is further demonstrated by trainer Paul Schmidt's comments to a freshman football player in the 1980s.

164.   Plaintiff John Doe MC-27, who has filed a complaint against U of M in Case Number 2:20-cv-10785-VAR-EAS on March 26, 2020 in the Eastern District of Michigan, attended U of M in the 1980s and 1990s on athletic scholarship for football.

165.   During John Doe MC-27's first physical examination by Dr. Anderson, Dr. Anderson groped, fondled, and cupped John Doe MC-27's penis and testicles for an excessively long time while Dr. Anderson's face was within inches of John Doe MC-27's genitals.

166.   John Doe MC-27 encountered longtime U of M trainer Paul Schmidt and other trainers as he exited his first football team physical examination by Dr. Anderson.

167.   Seeing that John Doe MC-27 was exiting his examination by Dr. Anderson, U of M trainer Paul Schmidt laughed and told John Doe MC-27 "get used to that," referring to Anderson's abusive examinations.

168.   The other trainers that were present laughed as well, and it was clear to John Doe MC-27 that Paul Schmidt and the other trainers knew what Dr. Anderson was doing in the exam room to athletes.

169.    The indifference and acceptance of Dr. Anderson's acts by trainers that also normalized Anderson's acts as required medical acts or treatment for all athletes across all teams as just part of participating in U of M athletics.

170.    During this time, Paul Schmidt and the other trainers were agents of the Athletic Department and U of M.

171.    Paul Schmidt is still employed by U of M and, upon information and belief, is currently the Assistant Athletic Director for the Athletic Department, demonstrating both Dr. Anderson's authority and influence within the Athletic Department, and U of M's failure to act despite repeated sexual assaults and reports of repeated sexual assaults.

172.    It is a sign of Dr. Anderson's continued power and influence at U of M that U of M adopted mandatory student-athlete physicals only after Dr. Anderson recommended this mandate; which, of course, gave Dr. Anderson increased access to male student-athletes to sexually abuse.

173.    During Dr. Anderson's time as a U of M employee, the football team won a national championship and numerous conference championships.

174.    It is a further sign of Anderson's power and influence at the U of M that Anderson travelled with the U of M's vaunted football team, stayed in the football team's hotel as part of the Athletic Department's traveling party, was included in every football team end-of-year bowl VIP traveling entourage, and was a fixture on the sidelines during Michigan's nationally televised football games.

175.   Archived records at the U of M's Bentley Library describe that Dr. Anderson's influence within the Athletic Department was such that he was able to scuttle a proposal to allow the athletes more latitude in choosing treatment by doctors other than Dr. Anderson.

176.   Dr. Anderson remained in a position of power and authority within the Athletic Department even though written exit evaluations by graduating senior athletes routinely gave Dr. Anderson poor grades for his treatment of the student- athletes that he was preying on.

177.   Dr. Anderson treated U of M athletes for every medical ailment, complaint, and injury as his U of M-assigned internist. He served as his first medical point of contact no matter the injury or ailment at issue, including everything from a cold to the flu to broken bones.

178.   During his employment, agency, and representations with U of M, Dr. Anderson sexually assaulted, abused and molested student athletes by engaging in nonconsensual sexual touching, assault, and harassment, including but not limited to medically unnecessary genital manipulation and digital anal penetration.

179.   Because U of M took no action to investigate the complaints from students that began as early as 1968, or earlier, and took no corrective actions even after Vice President Easthope attempted to fire Dr. Anderson in 1979, students and student-athletes were sexually assaulted, abused and molested by Anderson through nonconsensual digital anal penetration and nonconsensual sexual touching of genitals.

180.    The students he abused did not understand (as U of M did) the nature of the "treatment" Dr. Anderson administered, or rather that his putatively necessary medical treatment was not done to heal them but rather to satisfy Dr. Anderson's sexual desires.

181.    In particular, because so many were victimized, student-athletes "normalized" Dr. Anderson's abuse and accepted it as part of what they had to endure as an athlete already under intense, grueling training and physical demands, and they did not know that they were victims of assault at the time it occurred.

182.    Dr. Anderson's victims did not know, and could not reasonably understand that they were being sexually assaulted at the time Dr. Anderson abused them.

183.    Although uncomfortable with the treatments, the student-athletes were led to believe by those in authority, including Athletic Director Canham, coaches, trainers, and Dr. Anderson, that the treatments were medically necessary or helpful.

184.    As a result of the power imbalance, culture of retaliation, fraudulent concealment, and disguising abuse as legitimate medical procedures, most of Dr. Anderson's victims stayed silent about his abuse for years.

185.    Not all of Dr. Anderson's victims have stayed silent. Recently, a number of survivors have come forward to tell his stories of abuse.

186.     For example, the following survivors, in addition to many others, have come forward to reveal the pervasiveness of the sexual abuse committed by Dr. Anderson:

a.   Ron Weiser, current Regents chairman, has stated that he was first sexually abused by Dr. Anderson in 1963 as a freshman at the University and that the abuse continued through 1967, when he was a graduate student[9]. He has been quoted as stating that "Part of that story is that I am a survivor, and I experienced abuse by Dr. Anderson." *Id.*

b.   In 1971, Robert Julian Stone was sexually abused by Dr. Anderson during a medical examination[10]. Mr. Stone heroically reported the sexual abuse to U of M in 2019. *Id.*

c.   Ed Glazier started his graduate studies at the University in 1969.[11] When he received notice from his draft board requiring him to complete a physical, he found himself before Dr. Anderson as Dr. Anderson had a reputation for certifying people as gay to avoid the draft. *Id.* During the physical, Dr. Anderson laid down on the examination table, removed his pants, and masturbated himself. *Id.* Recounting the experiences of his friends, Mr. Glazier has stated that "'They told me that when he was manipulating himself, he would say, 'If you don't see anything, you could put your mouth on it.' It was clear what they had to do.'" *Id.*

---

[9] *See* Nolan Finley, *Finley: UM Regent, Donor Ron Weiser Says He Was Molested by Doctor, Too*,  Detroit News.com,  (last  visited  September  9,  2021), https://www.detroitnews.com/story/opinion/columnists/nolan-finley/2020/03/12/finley-um-regent-donor-ron-weiser-says-he-molested-doctor-too/5022591002/.

[10] *See* Tammy Webber and Kathleen Foody, *Victims Turn to Media to Expose Sex Abuse by College Doctors*,  Detroit News.com,  (last  visited  September  9,  2021), https://www.detroitnews.com/story/news/local/detroit-city/2020/02/24/victims-sex-abuse-media-um-doctor/111367742/.

[11] *See* David Jesse, *U-M Doctor Helped Men Avoid Vietnam War in Exchange for Sexual Favors, Ex-students  Say*,  Freep.com,  (last  visited  September  9,  2021), https://www.freep.com/story/sports/university-michigan/wolverines/2020/02/28/michigan-um-doctor-robert-anderson/4897540002/.

d. It has been reported that at least two other men have come forward and stated that Dr. Anderson was known to be willing to certify someone as gay in exchange for sexual acts or watching sexual acts. *Id.*

e. In 1973, JP DesCamp was sent to Dr. Anderson by his employer, General Motors, for a physical so that he could continue to keep his flight status[12]. During the physical, Dr. Anderson required Mr. DesCamp to remove his underwear and Dr. Anderson sexually abused Mr. DesCamp by penetrating his anus digitally and fondling his testicles. *Id.*

f. Dr. James Barahal, President and CEO of the Honolulu Marathon and former U of M cross-country team member, has come forward to report Dr. Anderson sexually abused him in 1975[13]. Dr. Barahal has stated that he visited the student health center at the University in 1975 to have his sore throat treated. *Id.* Instead of receiving appropriate medical treatment, Dr. Anderson abused Dr. Barahal by performing a digital rectal examination on him. *Id.*

g. An anonymous wrestler has stated that he was sexually abused by Dr. Anderson when Dr. Anderson digitally penetrated his anus on 10 to 20 occasions between 1976 and 1980[14].

h. Between 1980 and 1984, Dr. Anderson sexually abused a U of M football player four to five times a year by "touching his genitals hard" and "fingering his asshole." *Id.* Dr. Anderson was known as "Drop Your Drawers Anderson" and "Doc A" for "anal." *Id.*

i. Another anonymous wrestler has disclosed that he was on an athletic scholarship to the University between 1984 and 1989 and was sexually

---

[12] *See* David Jesse, *U-M Doctor's Accusers: University Allowed Horror Show to Go On for Decades*, FREEP.COM, (last visited September 9, 2021), https://www.freep.com/story/news/education/2020/03/05/university-michigan-doctor-robert-anderson-sexual-assault/4963338002/.

[13] *See* Mike Householder, *Honolulu Marathon CEO Says He Was Abused by University of Michigan Doctor*, AP News, (last visited July 13, 2020), https://apnews.com/article/us-news-honolulu-sports-general-mi-state-wire-michigan-fa17e881a780e121603147cc7e2b418d.

[14] *See* Steve Marowski, *3 More Lawsuits Filed Against University of Michigan Regarding Sexual Abuse Claims Against Late Doctor*, MLIVE.COM, (last visited July 13, 2020), https://www.mlive.com/news/ann-arbor/2020/03/3-more-lawsuits-filed-against-university-of-michigan-regarding-sexual-abuse-claims-against-late-doctor.html.

abused by Dr. Anderson during that time[15]. The wrestler was between the ages of 17 and 22 when he was sexually assaulted on at least 35 different occasions by Dr. Anderson when Dr. Anderson digitally penetrated his anus and fondled his genitals. *Id.*

j.   Yet another anonymous wrestler has stated that he was sexually abused by Dr. Anderson when Dr. Anderson digitally penetrated his anus on 8 to 10 occasions between 1993 and 1998[16].

k.   An anonymous former University football player from 1989 to 1993 has set forth that he was sexually abused by Dr. Anderson six times during physicals wherein Dr. Anderson handled and fondled his penis and testicles.[17] [18] This survivor has filed a lawsuit and alleged that "Despite his [the football player's] shock, pain and trauma, he rationalized Anderson's abuse as part of normal medical protocol."[19]

l.   Former University and Olympic wrestler Andy Horvat has come forward about being sexually abused in 1998 by Dr. Anderson[20]. Mr. Horvat has

---

[15] *See* David Jesse, *Former U-M Wrestler Files Lawsuit Against School Over Alleged Sexual Assault by Doctor*, FREEP.COM, (last visited September 9, 2021), https://www.freep.com/story/news/education/2020/03/04/lawsuit-michigan-doctor-robert-anderson/4954663002/.

[16] *See* Steve Marowski, *3 More Lawsuits Filed Against University of Michigan Regarding Sexual Abuse Claims Against Late Doctor*, MLIVE.COM, (last visited September 9, 2021), https://www.mlive.com/news/ann-arbor/2020/03/3-more-lawsuits-filed-against-university-of-michigan-regarding-sexual-abuse-claims-against-late-doctor.html.

[17] *See* Kim Kozlowski, *Lawsuit Seeking Class-action Status Filed Over Alleged UM Doctor Abuse*, DETROITNEWS.COM, (last visited September 9, 2021), https://www.detroitnews.com/story/news/local/michigan/2020/03/09/class-action-suit-filed-against-university-michigan-not-protecting-students-against-doctor/5002775002/.

[18] *See* Steve Marowski, *Lawsuit Seeks to Represent 'likely thousands' of Victims of Former UM Doctor*, MLIVE.COM, (last visited September 9, 2021), https://www.mlive.com/news/ann- arbor/2020/03/lawsuit-seeks-to-represent-likely-thousands-of-victims-of-former-um- doctor.html.

[19] *See* Kim Kozlowski, *Lawsuit Seeking Class-action Status Filed Over Alleged UM Doctor Abuse*, DETROITNEWS.COM, (last visited September 9, 2021), https://www.detroitnews.com/story/news/local/michigan/2020/03/09/class-action-suit-filed-against-university-michigan-not-protecting-students-against-doctor/5002775002/.

[20] *See* Larry Lage, David Eggert, Kathleen Foody & Mike Householder, *Wrestler Adds to Abuse Allegations Against University Doctor*, ABCNEWS.GO.COM, (last visited July 13, 2020),

stated that "'I was warned about him from teammates, saying, 'If anything happens and you go see the doctor, he's going to inappropriately touch you, that's just what Dr. A does.'"" *Id.* Mr. Horvat has also been quoted as stating that "'In my mind, he normalized what he was doing and made you think that was just a normal part of the procedure,' ... 'So why would you tell somebody?'" *Id.*

187.   On July 18, 2018, U of M alumnus Tad Deluca sent a letter to Warde Manuel, U of M Athletic Director, notifying Manuel—as he did Don Canham in 1975—of Dr. Anderson's sexual assault while Deluca was a student between 1972 to 1976.

188.   Upon information and belief, U of M then requested the U of M police department to open a non-public investigation, but U of M did not take further action to notify former students and/or the public about the allegations and/or investigation until 19 months later.

189.   University President Schlissel admitted on February 20, 2020, "Our (U of M) police found indications that U-M staff members were aware of rumors and allegations of misconduct during Anderson's medical exams[21]."

---

https://abcnews.go.com/Sports/wireStory/6th-man-claims-sexual-abuse- university-michigan-doctor-69107030.

[21] *See* The Associated Press & Caroline Llanes, *UM President Apologizes to "anyone harmed" by Late Doctor*, MICHIGANRADIO.ORG, (last visited July 13, 2020), https://www.michiganradio.org/post/um-president-apologizes-anyone-harmed-late-doctor.

190. As stated above, at least one of the U of M Board of Regents, Ron Weiser, Chair of the U of M Board of Regents, has personal knowledge that the complaints received on July 18, 2018, were and are true.

191. Another member of the U of M Board of Regents, Regent Paul Brown, recently publicly stated that three members of his family who were student-athletes at U of M were also sexually assaulted by Anderson.

192. Nonetheless, neither the University nor the Regents took any steps to notify the public nor its alumni student-athletes about Dr. Anderson's abuse until compelled to do so by the press in February 2020.

193. It was not until U of M received Mr. Deluca's letter in 2018—50 years after hiring Dr. Anderson, 50 years after U of M received first complaint about Dr. Anderson's misconduct, 43 years after Mr. Deluca's initial complaint, 15 years after Dr. Anderson's retirement, and 10 years after Dr. Anderson's death—that U of M requested police open an investigation into Anderson's misconduct.

194. Still, U of M did not take further action to notify former students and/or the public about the allegations and/or investigation until almost two years later.

195. On February 19, 2020, U of M, for the first time, publicly announced it had launched investigations into Dr. Anderson's sexual misconduct, admitting five former students had made abuse allegations.

196. U of M's 19-month delay in notifying the public and alumni about Dr. Anderson's abuse of student-athletes is consistent with the pattern of U of M's recent reactions to sexual abuse allegations.

197. For several years, U of M has been under intense media, public, and government scrutiny regarding its mishandling of sexual harassment and sexual assault by faculty members, including, but not limited to Professor David Daniels; and complaints of sexual misconduct and inappropriate behavior against Provost Martin Philbert.

198. At all relevant times, Dr. Anderson maintained an office at U of M in Ann Arbor, Michigan and treated patients at satellite offices owned and operated by U of M.

199. At all relevant times, U of M was acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or U of M.

200. At all relevant times, including the years 1966 to 2003, Dr. Anderson was acting within the course and scope of his employment or agency with U of M.

201. As the U of M Athletic Department's physician, Dr. Anderson had power, authority, and credibility that ensured compliance with his methods and orders.

202. U of M President Schlissel has stated that "The patient-physician relationship involves a solemn commitment and trust."

203. Because U of M took no action to investigate complaints since 1968 or before, took no corrective action to stop Dr. Anderson's abuse, and knew of Dr.

Anderson's sexual abuse of male and female students under the guise of medical treatment which put him in a position to commit further acts of genital groping and digital anal penetrations of male college students and athletes and digital vaginal penetration of female college students and athletes between the early 1960s and 2003, U of M knowingly placed Plaintiff in a position where he would likely be sexually abused.

204.   And because of U of M's failure to act, despite knowledge that Dr. Anderson was preying on male and female students under the guise of medical treatment, Plaintiff was in fact sexually assaulted, abused and molested by Dr. Anderson through nonconsensual digital anal penetration.

205.   The assault on Plaintiff could have been prevented if U of M had acted on and/or investigated complaints against Dr. Anderson that U of M had notice of as early as 1968.

206.   The assault on Plaintiff could have been prevented if U of M had warned Plaintiff, terminated Dr. Anderson or properly supervised him or trained Athletic Department supervisors. But, U of M failed to do any of these things that would have prevented Plaintiff's sexual abuse by Dr. Anderson.

207.   Rather than preventing Plaintiff's abuse, U of M chose to protect Dr. Anderson and its institution and enable Dr. Anderson to commit sexual abuse on the U of M students, including Plaintiff.

208.   Through Dr. Anderson's position with U of M and his notoriety and respect in the U of M community, particularly among high-ranking U of M coaches and administrators, Dr. Anderson used his position of authority as a medical professional to abuse Plaintiff without any reasonable supervision by U of M.

209.   All of Dr. Anderson's acts were conducted under the guise of providing medical care at his office at U of M.

210.   The failure to give proper notice or to obtain consent from Plaintiff robbed him of the opportunity to reject Dr. Anderson's treatments.

## V.   PLAINTIFF JOHN R.S. DOE'S ALLEGATIONS AND HIS DAMAGES FOR ALL CAUSES OF ACTION

211.   Even after receiving eight known reports of Dr. Anderson's sexual predation of students, U of M continued to employ him in a position of authority, and give him unfettered, unsupervised access to students, including Plaintiff.

212.   U of M's utter abdication of its duties and obligations to protect its students from a known sexual predator directly resulted in Plaintiff being sexually assaulted by Anderson in 1981.

213.   Plaintiff John R.S. Doe is an adult male and currently resides in the city of Grosse Pointe Shores, Wayne County, State of Michigan.

214.   Plaintiff was a student at U of M from approximately 1980-1985, graduating in 1985.

215.    While a student at U of M, Plaintiff participated in U of M's fraternity and intramural sports, including football.

216.    Plaintiff was sexually abused and molested by Dr. Anderson in 1981, in Washtenaw County, State of Michigan, under the guise of medical treatment.

217.    Dr. Anderson sexually abused Plaintiff by performing an unnecessary digital-rectal penetration under the guise of medical treatment for Dr. Anderson's own sexual gratification; and by verbally sexually harassing Plaintiff by forcing Plaintiff to share intimate and specific details about his sexual activities.

218.    At all relevant times to Plaintiff's allegations in this Complaint, Dr. Anderson was employed as a doctor by U of M.

219.    Dr. Anderson committed his sexual abuses and molestations against Plaintiff while in a position of trust, authority, and power granted to him by U of M.

220.    Dr. Anderson committed his sexual abuses and molestations against Plaintiff after U of M received numerous reports about Dr. Anderson's inappropriate behavior during student medical examinations.

221.    Dr. Anderson committed his sexual abuses and molestations against Plaintiff at a time when U of M knew that Dr. Anderson was conducting inappropriate medical examinations of students, and that Dr. Anderson was sexually abusing male and female students.

222.    The actions of U of M concealed the true nature of the sexual abuse and molestation committed against Plaintiff by Dr. Anderson.

41

223. Plaintiff has suffered emotional and physical damages as a result of Dr. Anderson's sexual abuse.

224. In the fall of 1981, Plaintiff was a 21-year-old U of M student, active in U of M fraternity and intermural sports, including football.

225. Sometime late in the fall semester, Plaintiff was struck in the groin while playing football and experienced intense and persistent pain in his testicles, and so he presented to UHS for an examination.

226. Plaintiff's injury was examined by medical students and/or residents, and at least one attending physician.

227. Despite this, after Plaintiff had been examined, Dr. Anderson also examined Plaintiff's penis and testicles.

228. Despite Plaintiff having presented after physical injury, Dr. Anderson was unusually interested in Plaintiff's sexual activities and proceeded to ask Plaintiff a barrage of intrusive questions, including how often he had sex, how many sexual partners Plaintiff had, and whether he had sex with men and women.

229. Plaintiff replied that he had only ever had sex with his then-girlfriend (now Plaintiff's wife), who in turn had only ever had sex with him. Plaintiff knew he did not have an STD. Regardless, Anderson subjected him to an invasive STD test.

230. Anderson digitally anally penetrated Plaintiff under the guise of a rectal examination, despite such an examination being medically unnecessary.

231.    Following the rectal examination, Dr. Anderson wrote his phone number on a business card and handed it to Plaintiff. Dr. Anderson told Plaintiff that he wanted to see Plaintiff again in one week, and Plaintiff should call Dr. Anderson at any time.

232.    Plaintiff was extremely distressed, and left UHS as quickly as possible without scheduling the follow-up appointment ordered by Dr. Anderson.

233.    Plaintiff experienced physical pain in his penis and rectum for some time after Dr. Anderson's sexual abuse.

234.    The experience made a deep, negative impression on Plaintiff.

235.    Plaintiff to this day suffers continuing trauma as a result of U of M's institutional betrayal and failure to implement proper protective measures.

236.    Without implementing the proper policies and procedures to protect students from serial sexual predators, Plaintiff will continue to suffer damages as a result of U of M's institutional betrayal.

237.    U of M created, and was deliberately indifferent, to a sexually hostile culture within its athletic and student health programs, by, among other things:

a.    Mishandling students' reports about Dr. Anderson's conduct and/or discouraging students from reporting Dr. Anderson's conduct;

b.    Failing to promptly and appropriately investigate, remedy, and respond to complaints about Dr. Anderson's conduct;

c.    Increasing Dr. Anderson's access to U of M student-athletes, despite students' complaints about Dr. Anderson's conduct

d. Failing to adequately supervise Dr. Anderson, after learning that he posed a substantial risk to the safety of all male students;

e. Failing to take corrective action to prevent Dr. Anderson from sexually harassing other students;

f. Failing to terminate Dr. Anderson and remove him from U of M's campus; and

g. Joking about Dr. Anderson's conduct with students.

238. Plaintiff first learned Dr. Anderson was a serial sexual predator on or after February 19, 2020, when the news broke that several former students had come forward with stories of sexual abuse at the hands of Anderson under the guise of medical treatment while students at U of M.

239. Plaintiff's damages arise from two distinct harms: (1) the revelation that Dr. Anderson's acts, were not in fact, innocent, or merely odd, but rather were criminal sexual conduct; and (2) the revelation that the University, an integral part of Plaintiff's life and identity for over 40 years, intentionally enabled and exposed him to a sexual predator on Plaintiff in the guise of a competent and concerned medical physician.

240. Since these revelations, Plaintiff has been suffering shame, shock, humiliation, emotional distress, and related physical manifestations thereof, embarrassment, and loss of self-esteem.

241.   The news about Dr. Anderson disturbed Plaintiff and revived emotions he felt when the assault occurred, and during the aftermath, and revealed to Plaintiff that the assault created a lasting trauma to Plaintiff's psyche and trust, which has caused, and continues to cause him anxiety.

242.   Plaintiff has also suffered deeply, emotionally, and psychologically, in ways that have manifested physically, from discovering on or after February 19, 2020, that his beloved alma mater knew about Dr. Anderson's sexual assaults for decades; yet did nothing to stop Dr. Anderson.

243.   Aside from these understandable injuries, other harms include: (a) feeling he was not protected by U of M officials, leadership, and others in positions of responsibility; (b) feeling betrayed because U of M forced Dr. Anderson on him and his unsuspecting schoolmates knowing that Dr. Anderson was a predator; (c) worries that friends and family may find out that Plaintiff was a victim; (d) a sense of loss and grief as to how this assault has affected him; and (e) anxiety of how these harms will manifest themselves in the Plaintiff's future.

244.   Despite knowledge about Dr. Anderson's misconduct, U of M knowingly kept him in positions where he had direct and intimate access to prey upon college athletes and students, such as Plaintiff, from the early 1960s to 2003.

245.   These revelations have been traumatic and emotionally and psychologically damaging, forcing Plaintiff to relive the trauma of what he now knows to have been sexual assault.

45

246. It has shattered Plaintiff psychologically and emotionally to learn that his alma mater betrayed him and so many others by placing and keeping a known, prolific sexual predator on staff where he had direct and unlimited access to young college students to prey on.

## VI. THE PHYSICIAN-PATIENT FIDUCIARY RELATIONSHIP CREATED BY U of M

247. Physicians like, and including, Dr. Anderson enjoy a power imbalance over patients, such as Plaintiff, in treatment because patients present with health concerns and are expected to comply with physicians' orders, including undressing[22].

248. In addition to the power imbalance, patients like Plaintiff often times cannot recognize abusive acts because they do not understand or know what is or is not medically necessary. *Id.*

249. Among other reasons, it is this social power imbalance and the fact that "physicians possess superior knowledge by virtue of his medical training" that the American Medical Association finds the doctor-patient relationship to be a fiduciary relationship[23].

---

[22] *See* James M. DuBois, et al., *Sexual Violation of Patients by Physicians: A Mixed-Methods, Exploratory Analysis of 101 Cases*, JOURNALS.SAGEPUB.COM, Sexual Abuse 2019, Vol. 31(5) 503–523, (last visited September 10, 2021), https://journals.sagepub.com/doi/10.1177/1079063217712217.

[23] *See* Tanya J. Dobash, *Physician-Patient Sexual Conduct: The Battle Between the State and the Medical Profession*, 50 Wash. & Lee L. Rev. 1725 (1993), see also https://scholarlycommons.law.wlu.edu/wlulr/vol50/iss4/17.

250.   In the same way, both the Sixth Circuit Court of Appeals and Michigan courts recognize this fiduciary relationship between a doctor and his patient, where "the patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well." *United States v. Tatum*, 518 F.3d 369, 373 (6th Cir. 2008); *Hammonds v. Aetna Cas. & Sur. Co.*, 7 Ohio Misc. 25 (N.D. Ohio 1965); *Utica Steel, Inc. v. Amormino*, No. 309112, 2014 WL 1401939, at *6 (Mich. App., Apr. 10, 2014).

251.   U of M arranged, without Plaintiff's consent, that he would see Dr. Anderson as his physician during the time Plaintiff was a student, despite knowing Dr. Anderson was a sexual predator of male and female students.

252.   In this way, U of M created a fiduciary relationship between Dr. Anderson and Plaintiff.

253.   Further, in doing so, U of M became a fiduciary, both directly and vicariously, of Plaintiff for any and all acts by Dr. Anderson during Dr. Anderson's physician-patient relationship with Plaintiff.

254.   Because U of M forced this relationship on Plaintiff – a fiduciary relationship with Plaintiff's U of M-chosen physician, Dr. Anderson – U of M as a principal to its agent, Dr. Anderson, owed certain duties under fiduciary and agency law to disclose and provide Plaintiff with more, not less information, regarding the true nature of Dr. Anderson's acts done during the course of medical treatment on Plaintiff.

## VII.   THE FRAUDULENT CONCEALMENT OF DR. ANDERSON'S SEXUAL ABUSE

255.   Both Dr. Anderson and U of M through his employees, agents, and representatives, including but not limited to administrators, athletic coaches, trainers, and directors, fraudulently concealed the existence of claims, both before and after the Plaintiff's encounter with Dr. Anderson, by: (1) concealing that the uncomfortable procedures conducted during the purported medical examination were in fact sexual abuse; (2) concealing that U of M and its employees, agents, and representatives were aware of Dr. Anderson's prolific and ongoing sexual abuse and did nothing to stop it; (3) affirmatively telling Plaintiff that the procedures were normal and/or necessary; (4) publishing a statement that Dr. Anderson was a renowned physician to be trusted and respected in a publication delivered to and read by University students; (5) concealing that U of M was aware of Dr. Anderson's abuse since at least 1968, or before, thereby concealing U of M's identity to Plaintiff as a "person who is liable for the claim."

256.   Dr. Anderson's fraudulent concealment is imputed to U of M.

257.   Dr. Anderson made affirmative representations to Plaintiff, referred to collectively as "Dr. Anderson's representations," that:

a.   Dr. Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

b. Dr. Anderson's anal penetrations and/or genital examinations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial even when they were medically unnecessary, and Plaintiff did not present with issues related to his anus; and

c. Dr. Anderson's anal penetrations and/or genital examinations were just another required procedure athletes and students must endure as a part of the systemic student-athletic department culture in which student athletes were rigorously disciplined to obey without question every requirement related to improving their physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges.

258. Dr. Anderson's representations were false. The U of M Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any medical treatment of any issues normally experienced by college athletes.

259. Dr. Anderson knew the representations were false. He conducted the sexual abuse and assault for no reason other than for his own empowerment, sexual gratification, and/or pleasure.

260. Dr. Anderson knew the genital examination and digital anal penetration was not proper, appropriate, legitimate, and/or considered within the standard of care

49

by any physician of any specialty and/or sports therapist, particularly as many patients were young men (generally ages 17-25).

261. Further, Dr. Anderson represented and stated his acts were "protocol," "what was necessary," "had to be done," or similar phrases, and/or Dr. Anderson represented that he was checking for an illness unrelated to the complaint that gave rise to the visit to Dr. Anderson, such as prostate and/or testicular cancer.

262. These remarks normalized Dr. Anderson as just part of the comprehensive and thorough nature of a major health system, and major college sports injury-related physicals and examinations, such that they happened to everyone and was not outside the norm.

263. Dr. Anderson's representations were material, in that had Plaintiff known the representations were false, Plaintiff would have stopped the examination by Anderson immediately.

264. Dr. Anderson's representations were made with the intent that Plaintiff would rely on him as Dr. Anderson sought to continue sexually assaulting Plaintiff, and others, evidenced by the fact that Dr. Anderson did, in fact, continue sexually assaulting Plaintiff, and others.

265. Dr. Anderson's representations were also made with the intent of concealing from Plaintiff that he had a cause of action against Dr. Anderson and/or U of M.

266. Plaintiff did, in fact, rely on Dr. Anderson's representations; indeed, Dr. Anderson's representations led Plaintiff to allow purported medical treatment from Dr. Anderson, and had he known Dr. Anderson's representations were false, Plaintiff would have immediately stopped the encounter with Dr. Anderson.

267. Dr. Anderson knew, and Plaintiff was in fact, particularly susceptible to believing Dr. Anderson's misrepresentations because:

    a. Dr. Anderson's abuse continued while Plaintiff was a young and naïve adult without medical knowledge or training;

    b. Dr. Anderson's representations were made within the context of a pervasive culture created by statements made by representatives of U of M, including coaches, trainers, directors, and other leaders of the Athletic and Medical Departments, that Dr. Anderson's treatments were necessary and Dr. Anderson was a competent and ethical physician, to be trusted and never questioned;

    c. Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate a legitimate and appropriately performed genital or anal examination from a sexual assault;

    d. Plaintiff could not have possibly known because there were no parents, guardians, caregivers, and/or other medical professionals in the room

during the genital and/or anal examinations to observe, question, and/or discover that Dr. Anderson's treatments were sexual assaults, and this concealment from other adults deprived them of the opportunity to inform Plaintiff that he had been sexually assaulted and had a cause of action;

e. Based on neuroscience research, the prefrontal cortex of the brain, which people use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f. Based on neuroscience research, as the prefrontal cortex of the brain matures young adults are able to make better judgments;

g. Plaintiff was intimidated by Dr. Anderson's position and authority and therefore believed his representations;

h. Plaintiff trusted Dr. Anderson due to his position and authority;

i. Plaintiff was compelled by Dr. Anderson to undergo the genital and anal examination and not question it if he wanted to obtain medical treatment for his injury;

j. Plaintiff was not aware of any other students coming forward with allegations of abuse, particularly because Dr. Anderson and U of M concealed any such allegations from students and the public in general and since the culture of the Athletic Department normalized Dr. Anderson's treatments;

k. Plaintiff had never previously heard about allegations in the media regarding sexual assaults or misconduct by Dr. Anderson, indeed because there were none; and

l. Plaintiff was never told by Dr. Anderson that his conduct was sexual in nature, unlike other survivors of sexual abuse who are typically told by his perpetrators that his conduct is of a sexual nature and to conceal the sexual conduct from parents and others.

268. Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Dr. Anderson and/or U of M until he read news reports on or about February 19, 2020, regarding U of M's Police Department's investigation, at which point, at the earliest, Plaintiff became aware that he was a victims of sexual assault and that U of M indirectly or directly caused the abuse by being aware Dr. Anderson was a sexual predator and failing to stop Dr. Anderson from harming students.

269. Dr. Anderson and U of M also breached a fiduciary duty to Plaintiff. Dr. Anderson and U of M were fiduciaries of Plaintiff since Plaintiff was a patient of Dr. Anderson entrusted to Dr. Andersons' care. U of M's failure to disclose material information to Plaintiff was fraudulent.

270. Dr. Anderson further concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry, so he and U of M could escape investigation, in that he:

a. Prevented other medical professionals, trainers, parents, guardians, and/or caregivers from being in the room during the encounter with Plaintiff while he sexually assaulted Plaintiff; and

b. Did not abide by or follow the standard and care which requires another medical professional, trainer, parent, guardian, and/or caregiver be in the room during the examination and treatment of patients.

271.    Dr. Anderson's representations caused Plaintiff injuries related to: (1) the sexual assault; (2) discovering Dr. Anderson's purported "treatment" was in fact sexual assault on or about February 19, 2020; and (3) discovering Plaintiff beloved alma mater, in many respects, betrayed him by placing him in the care of a known sexual predator.

272.    Dr. Anderson committed fraudulent concealment by concealing fraud with affirmative acts designed and/or planned to prevent inquiry, so he and U of M could escape investigation.

273.    At all times pertinent to this action, Dr. Anderson was an agent, apparent agent, servant, and employee of U of M and operated within the scope of his employment, and his negligence is imputed to U of M.

274.    U of M, through its employees, agents, and representatives, including but not limited to members of U of M's administration, made affirmative representations to Plaintiff, referred to collectively as "U of M's representations," that:

a. Dr. Anderson was to be trusted and not questioned, and his devotion to medical care at U of M was worthy of public recognition and celebration,

as reflected in his subsequent statement: "The University Health Service staff wish to acknowledge the 11 years of leadership provided by Robert E. Anderson, M.D. In January of 1980, Anderson resigned as Director of the University Health Service to devote more time to his clinical field of urology/andrology and athletic medicine…his many contributions to health care are acknowledged…The University Health Service staff wish to thank Anderson for his years of leadership and to dedicate the Annual Report to him," published in the Acknowledgement preface of Volume III of the President's Report of The University of Michigan for 1979-1980;

b.  Dr. Anderson was to be trusted and not questioned as his services were worthy of recognition by U of M dedicating "the Annual Report to him" even though U of M and its executives knew that Vice President Easthope had "terminated" Dr. Anderson for his inappropriate sexual conduct toward male students;

c.  Dr. Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial;

d.  Dr. Anderson's genital groping and/or digital anal penetrations were normal, necessary, proper, appropriate, legitimate, and/or medically beneficial, when the patient is a healthy male between the ages of 17 and 25;

55

e.  Dr. Anderson would treat his ailments and injuries in an ethical and competent manner, and therefore non-criminal manner;

f.  Dr. Anderson's genital groping and/or digital anal penetrations were just another required procedure student-athletes must endure as a part of the systemic athletic medical department culture in which student athletes were rigorously disciplined to obey without question every requirement related to improving his or her physical health and, in doing so, adapting to overcome high levels of emotional, physical, and psychological stress and challenges; and,

g.  There was nothing wrong with anything Dr. Anderson did and so there was no possible cause to complain against Dr. Anderson and/or U of M.

275.  These affirmative representations were reasserted each time U of M, its agents in the Athletic Department, head coaches, assistant coaches, and trainers sent an athlete to Dr. Anderson for treatment as each order to see Dr. Anderson was an affirmative representation that Dr. Anderson was competent, ethical, and would "do no harm," or assault the respective athletes.

276.  U of M's representations were false. The U of M's Public Safety Department's recent investigation involving contact with medical professionals establishes that extended genital examinations and digital anal penetrations are almost never needed for any physical or medical treatment of any other issues normally experienced by college athletes.

277.   U of M knew the representations were false. U of M received several complaints since, at least, the 1960s about Dr. Anderson's sexual assaults prior to Plaintiff arriving on campus. Indeed, U of M removed Dr. Anderson from his position as UHS Director in 1979 because of sexual assault allegations, thereby demonstrating U of M's knowledge the representations were false.

278.   U of M made the material representations, knowing they were false and/or made the material representations recklessly, and as a positive assertion, in that they had previously received strikingly similar complaints of abuse by Dr. Anderson from other students and student athletes and knew that the appropriateness of his genital examinations and digital anal penetrations had been questioned in the past.

279.   U of M's representations were made with the intent that Plaintiff would rely on them as U of M sought to prevent Plaintiff from discovering he had a cause of action against Dr. Anderson and/or U of M.

280.   U of M concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of fraud, in that they:

a.   Refused to terminate Dr. Anderson and thus validated him through continued employment as a physician with one of the world's great institutions of higher learning;

b. Affirmatively lied in written publications about Dr. Anderson "resigning" from UHS when he was fired, and then reinstated but demoted him, for assaults on male students;

c. Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Dr. Anderson's genital and anal examinations; and

d. Did not create a policy to require adults, parents, chaperones, guardians, and/or caregivers be present during an examination of a minor or young athlete by a physician.

281. U of M knew that Plaintiff was, in fact, particularly susceptible to believing U of M's representations and misrepresentations because:

a. Dr. Anderson's abuse occurred while Plaintiff was young and a naïve adult;

b. U of M's representations were made within the context of a pervasive culture created by statements made by U of M representatives, including coaches, trainers, directors, and other leaders of the Athletic Department, that Dr. Anderson's treatments were necessary and Dr. Anderson was a competent and ethical physician, to be trusted and never questioned;

c. Plaintiff had little or no prior experience with legitimate and appropriately performed treatments that involve extended genital examinations and digital anal penetrations, so it was impossible for Plaintiff to differentiate

a legitimate and appropriately performed genital and/or anal examination from a sexual assault;

d.  Plaintiff could not have possibly known because there were no parents, coaches, guardians, caregivers, and/or other medical professionals in the room during the genital and anal examinations to observe, question, and/or discover that his genital examination was sexual assault and inform Plaintiff that he had been sexually assaulted and had a cause of action;

e.  Based on neuroscience research, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 25;

f.  Based on neuroscience research, as the prefrontal cortex of the brain matures teenagers are able to make better judgments;

g.  Plaintiff was intimidated by Dr. Anderson's authority and position and therefore believed his representations and followed protocol to allow Dr. Anderson to act on Plaintiff;

h.  Plaintiff relied on the Athletic Department/Health Department and trusted Dr. Anderson due to his notoriety and reputation;

i.  Plaintiff was compelled by Dr. Anderson to undergo an improper genital examination like other athletes and students and not to question them if he wanted to obtain treatment;

j. Plaintiff had no reason to believe or be aware of any other students coming forward with allegations of abuse, particularly since Dr. Anderson and U of M concealed any such allegations and since the culture of the Athletic Department normalized Dr. Anderson's treatments;

k. Plaintiff had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Anderson; and

l. Plaintiff was never told by Dr. Anderson that his conduct was sexual in nature, unlike other victims of sexual abuse who are typically told by their perpetrators that his conduct is of a sexual nature and to conceal the sexual conduct from his parents and others.

282. Accordingly, Plaintiff did not know, could not have reasonably known, and was reasonably unaware of a possible cause of action that he had against Dr. Anderson or U of M until he read news reports on or about February 19, 2020, or later, regarding U of M's Police Department's investigation, at which point Plaintiff became aware that he was a victim of sexual assault and that U of M indirectly or directly caused the abuse by being aware Dr. Anderson was a sexual predator and failing to stop him from harming students.

283. In addition to affirmative false representations, U of M officials, agents, and representatives failed to disclose to Plaintiff that he had been sexually abused and that Dr. Anderson had a history of committing sexual assaults in the guise of medical treatment.

284.   Because U of M had a fiduciary duty to Plaintiff, and it employed Dr. Anderson who had a doctor-patient relationship with Plaintiff, the failure to disclose material information is also fraudulent.

285.   At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, coaches, and directors of U of M were agents, apparent agents, servants, and employees of U of M and operated within the scope of their employment and their fraudulent concealment is imputed to U of M.

286.   Further, Plaintiff, a student and participant in U of M athletic programs, (and his parents) trusted and relied on the University's specific representations during his enrollment process that they would take care of and protect Plaintiff during his academic career at U of M, including, among others, taking care of medical needs through quality health care to treat any injuries and illnesses Plaintiff incurred during his time at the University, which included access to U of M's world- renowned hospital and a team of excellent doctors who were excellent, ethical, and would only do good, not harm, for Plaintiff during the course of his medical treatments.

287.   Further, as pled above, during his time as a student at U of M and participant in U of M athletic programs, U of M repeatedly represented to Plaintiff that he would get the best medical treatment from U of M's excellent medical facilities and doctors and trainers, and that all medical treatment (and each individual treatment) would only be treatment that was medically necessary to treat his injury or illness, and

that treatment would only be for the purposes of healing Plaintiff, and doing Plaintiff no harm.

288.    U of M's representations caused Plaintiff injuries related to: (1) the sexual assault; (2) discovering Dr. Anderson's uncomfortable treatments was in fact sexual assault on or after February 19, 2020; and (3) discovering Plaintiff's beloved alma mater betrayed him by exposing him to a known sexual predator.

289.    Therefore, U of M committed fraudulent concealment of the sexual abuse committed by Dr. Anderson against Plaintiff, as described in detail above and below.

## VIII.  CAUSES OF ACTION AGAINST ALL DEFENDANTS

### A.    COUNT I: VIOLATIONS OF TITLE IX – 20 U.S.C. § 1681, *ET. SEQ.*

290.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs.

291.    Title IX's statutory language states "No person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..."

292.    Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature and includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

293.   Title IX covers all programs of a school and extends to sexual harassment and assault by employees, students and third parties.

294.   Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities.

295.   Plaintiff is a "person" under Title IX's statutory language. *See* 20 U.S.C. § 1681 (A).

296.   At all relevant times, U of M has received federal financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. §1681(a), *et seq.*

297.   U of M is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

298.   Dr. Anderson's actions and conduct were carried out by, through, and under the auspices of U of M's various medical programs as a doctor employed by U of M.

299.   Dr. Anderson's sexual abuse, molestation, and harassment of students including Plaintiff, including, but not limited to, the fondling of testicles, the fondling and masturbation of penises, non-consensual digital anal penetration, forcing students into the manual manipulation of Dr. Anderson's penis, forcing students into touching and fondling of Dr. Anderson's genitals, and other lewd behavior as described above was sexual discrimination and sexual harassment under Title IX.

300.   U of M owed Plaintiff duties under Title IX, which included duties to not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, or any other form of sexual misconduct.

301.   U of M, pursuant to Title IX, was obligated and required to investigate all allegations of sexual assault, battery, molestation and harassment, including allegations that sexual assault, battery, molestation and harassment has been committed by an employee, student or third party.

302.   Dr. Anderson's sexual abuse committed against Plaintiff constitutes sex discrimination under Title IX.

303.   Dr. Anderson's sexual harassment was so severe that it denied Plaintiff educational opportunities, including adequate and appropriate medical care.

304.   U of M had actual knowledge, dating back to approximately 1968 at the latest, that Dr. Anderson was targeting and preying upon U of M students and student-athletes under the guise of medical examinations.

305.   U of M gained further knowledge of Dr. Anderson's sexual abuse on at least ten known and separate occasions from 1968 to 1994.

306.   An "appropriate person[s]" of U of M, within the meaning of Title IX, including but not limited to, the U of M representatives at UHS that Mr. Bailey reported his sexual abuse to; former U of M track and field coach Don Canham; former U of M gymnastics coach Newt Loken; former U of M head wrestling coach Bill Johannesen; former U of M track and field coach Jack Harvey; former U of M track and field coach

Ron Warhurst; former U of M Vice President of Student Life Tom Easthope; and other representatives and "appropriate persons" at U of M, had actual and/or constructive notice of sexual abuse, assault, battery, molestation, and harassment committed by Dr. Anderson as described further herein this Complaint.

307.  In addition to the known reports of Dr. Anderson's sexual abuse, U of M had knowledge by and through its coaches and representatives as evidenced by the way that these persons in power referred to his known sexual abuse, such as by referring to him as "Dr. Drop Your Drawers."

308.  U of M failed to place guidelines or institute any protective measures against Dr. Anderson to protect U of M's students and student-athletes.

309.  Not only did U of M not take action to stop Dr. Anderson, it actively promoted him both internally in his roles and externally as a renowned doctor.

310.  By failing to act and promoting Dr. Anderson, U of M increased his ability to use his power, trust, and authority to sexually abuse hundreds, if not thousands, of U of M students and student athletes.

311.  U of M acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by Dr. Anderson by engaging in the following non-exhaustive list of acts:

    a.  Allowing Dr. Anderson to continue his employment at U of M and to continue to have access to students on U of M's campus after receiving actual knowledge and notice of Dr. Anderson's sexual abuse;

b. Failing to properly address the prior allegations as required by Title IX;

c. Failing to institute corrective measures to prevent Dr. Anderson from violating and sexually abusing students and student-athletes;

d. Failing to adequately supervise Dr. Anderson while providing medical services on behalf of U of M; and

e. Failing to protect students and student-athletes on U of M's campus from Dr. Anderson's sexually abusive behavior. of M's failure to investigate or take any action to protect its students and its student-athletes was deliberately indifferent to the health and wellbeing of its students and student-athletes and the sexual abuse committed against them by Dr. Anderson, including Plaintiff.

312. U of M acted with deliberate indifference to Plaintiff because of its lack of response to the allegations of sexual assault, abuse, and molestation was clearly unreasonable in light of Dr. Anderson's known habit of sexually abusing U of M students and student-athletes.

313. U of M's failure to promptly and appropriately remedy and respond to the sexual abuses committed by Dr. Anderson after U of M received notice of Dr. Anderson's sexual abuse subjected Plaintiff to abuse and harassment as well as a sexually hostile environment.

314. U of M failed to adequately supervise or otherwise ensure Dr. Anderson complied with Title IX and other state and federal laws even though U of M had gained

actual knowledge that Dr. Anderson posed a substantial risk of committing additional sexual abuse against students and student-athletes.

315.   U of M's deliberate indifference effectively denied Plaintiff access to educational opportunities at U of M, including adequate and appropriate medical care.

316.   U of M's failure to properly and appropriately investigate and take corrective action for the complaints of Dr. Anderson's sexual abuse, assault, battery, molestation, and harassment resulted in Plaintiff being subject to sexual abuse, assault, battery, molestation, harassment, and a sexually hostile environment.

317.   U of M's failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice subjected Plaintiff to sexual abuse, assault, battery, molestation, harassment, and a sexually hostile environment, effectively denying him access to educational and other opportunities at U of M, including adequate and appropriate medical care.

318.   U of M failed to offer counseling services to current or former victims of Dr. Anderson, including Plaintiff.

319.   As a direct and/or proximate result of U of M's actions and/or inactions, Plaintiff has suffered injuries and damages including, but not limited to, discomfort, sleep deprivation, anxiety, emotional distress, shock, humiliation, grief, embarrassment, loss of enjoyment of life, and other effects on his physical and mental well-being and Plaintiff will continue to suffer pain of mind and body in the future. Plaintiff was also

otherwise prevented and will continue to be prevented from obtaining the full enjoyment of life.

### B. COUNT II: VIOLATIONS OF CIVIL RIGHTS – 42 U.S.C § 1983

320. Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs.

321. Plaintiff is entitled to certain rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

322. Plaintiff is an adult man at this time and was a young and naïve 21-year-old college student when sexually abused and assaulted by Dr. Anderson.

323. Dr. Anderson specifically targeted males to perpetrate his sexually abusive and assaultive acts, although he also sexually abused female patients.

324. At all relevant times, Plaintiff enjoyed the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

325. At all relevant times, U of M and Dr. Anderson were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or U of M.

326. The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in U of M's position should have known.

327.    U of M had the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

328.    As a matter of custom, policy, and/or practice, U of M had and still has the ultimate responsibility and authority to investigate complaints against its employees, agents, and representatives from all individuals including but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives.

329.    U of M failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiff's rights, including his right to bodily integrity.

330.    As a result, U of M deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

331.    U of M also failed to exercise its authority to investigate Dr. Anderson and did so with deliberate indifference.

332.    U of M had a duty to prevent sexual assault, abuse, and molestation on its campus, premises, and during school related activities, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

333.    Ultimately, U of M failed to adequately and properly address the numerous complaints of its students and student-athletes beginning at the latest in 1968 by failing to the do the following, including but not limited to, failing to:

a. Prevent Dr. Anderson gaining access the population of students and student-athletes who would be less likely to complain about Dr. Anderson's conduct for multiple reasons, including their status as student-athletes who were required to have exams done by Dr. Anderson, their status as gay persons, the real or perceived stigma associated with being a survivor of sexual assault, their status as patients of Dr. Anderson, and other reasons;

b. Perform a thorough investigation into improper conduct by Dr. Anderson after receiving complaints in 1968, 1969, 1975, 1976, 1979, 1982, 1983, 1988, and 1994, at a minimum;

c. Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of Dr. Anderson;

d. Prevent college officials from deeming Dr. Anderson able to continue his employment after being fully informed and notified of the sexual abuse and assaults that he had been and was committing against students and student-athletes; and,

e. Produce and implement any institutional guidelines to protect students and student-athletes following sexual abuse reported in 1968, 1969, 1975, 1976, 1979, 1982, 1983, 1988, and 1994, at a minimum.

334. U of M's failure to adequately address the 1968, 1969, 1975, 1976, 1979, 1982, 1983, 1988, and 1994 complaints and reports led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Dr. Anderson, including Plaintiff.

335. By failing to prevent the aforementioned sexual assault, abuse, and molestation and by failing to appropriately respond to the reports of Dr. Anderson's sexual assault, abuse, and molestation, U of M's actions amounted to deliberate indifference, therefore U of M is liable to Plaintiff pursuant to 42 U.S.C. § 1983.

336. U of M tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Dr. Anderson, with the result that Dr. Anderson was allowed to violate the rights of persons such as Plaintiff.

337. U of M's actions and/or inactions amounted to action with a discriminatory purpose against Plaintiff.

338. U of M is also liable to Plaintiff under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiff of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

339. As a direct and/or proximate result of U of M's actions and/or inactions, Plaintiff has suffered injuries and damages including, but not limited to, discomfort, sleep deprivation, anxiety, emotional distress, shock, humiliation, grief, embarrassment,

loss of enjoyment of life, and other effects on his physical and mental well-being and Plaintiff will continue to suffer pain of mind and body in the future. Plaintiff was also otherwise prevented and will continue to be prevented from obtaining the full enjoyment of life.

## IX.    ADDITIONAL CAUSES OF ACTION

### State Law Claims under Michigan Law

340.    Plaintiff realleges and incorporates by reference the allegations contained in all previous paragraphs.

341.    Plaintiff reserves the right to amend this Complaint to add additional causes of action that arise under Michigan law and DeLuca retains the right to pursue any and all applicable causes of action that arise under Michigan law pursuant to the tolling agreement entered in this matter and all other applicable statutes.

342.    Plaintiff reserves the right to bring, at a minimum, the following causes of action under Michigan law:

a.    Violations of the Elliot-Larson Civil Rights Act, M.C.L. 33.2101, et seq.

b.    Violations of the Michigan Constitution, Including violation of Article 1 § 17.

c.    Gross Negligence.

d.    Negligence.

e.    Vicarious Liability.

f.    Express/Implied Agency.

g.  Negligent Supervision.

h.  Negligent Failure to Warn or Protect.

i.  Negligent Failure to Train or Educate.

j.  Negligent Retention.

k.  Intentional Infliction of Emotional Distress.

l.  Negligent Infliction of Emotional Distress.

m. Fraud and Misrepresentation.

## X.    REQUEST FOR RELIEF AND JURY DEMAND
### <u>REQUESTED RELIEF</u>

Plaintiff requests this Court and the finder of fact to enter a Judgment in the Plaintiff's favor against U of M (The University of Michigan and The Regents of The University of Michigan) on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seek against U of M (The University of Michigan and The Regents of The University of Michigan) all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby requests that the trier of fact, be it judge or jury, award Plaintiff all applicable damages, including but not limited to compensatory, special, exemplary, and/or punitive damages, in whatever amount Plaintiff is entitled, and all other relief arising out of law, equity, and fact, also including, but not limited to:

A.    Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to

73

medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiff's Constitutional, Federal, and State rights, loss of social pleasure and enjoyment, and other damages to be proved;

B.    Punitive and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

C.    Reasonable attorney fees, costs and interest; and

D.    Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

Dated: October 25, 2021        **DEBORAH GORDON LAW**

/s/Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/Fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

## <u>JURY DEMAND</u>

Plaintiff **JOHN R.S. DOE**, by his attorneys **Deborah Gordon Law**, demands

a trial by jury of all the issues in this cause.

Dated:  October 25, 2021        **DEBORAH GORDON LAW**

<u>/s/Deborah L. Gordon (P27058)</u>
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/Fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com